[600 NYS2d 443]

ALH PROPERTIES TEN, INC., et al., Respondents, v 306-100TH STREET OWNERS CORP., Appellant.

First Department, June 29, 1993

## APPEARANCES OF COUNSEL

*Eric B. Levine* of counsel, New York City *(Frederick K. Mehlman* and *Stuart M. Saft* with him on the brief; *Wolf Haldenstein Adler Freeman & Herz,* attorneys), for appellant.

*Robert A. Wolf* of counsel, New York City *(Kenneth H. Amorello* with him on the brief; *Robinson Silverman Pearce Aronsohn & Berman,* attorneys), for respondents.

## OPINION OF THE COURT

Ross, J.

The primary issue presented by this appeal concerns the viability and extent of a cooperative corporation's lien (for obligations other than maintenance), upon the unsold shares retained by the sponsor, where the sponsor's shares have been pledged to a lender to secure a loan, and then subsequently purchased at a foreclosure sale. The Court at IAS concluded that, while the cooperative corporation's lien for arrears in maintenance charges due under the proprietary leases must be satisfied, the corporation's lien on the shares for so-called "nonmaintenance obligations" incurred by the sponsor in connection with the conversion, cannot be enforced, once the shares have been foreclosed upon and thereafter sold at auction.

For the reasons that follow, we conclude that in this case, the cooperative corporation's lien on the sponsor's unsold shares for nonmaintenance obligations, which is stated both in the bylaws of the corporation and by endorsement upon the shares, is enforceable, and has priority even though the shares have been foreclosed upon and sold at auction by the lender.

Defendant 306-100th Street Owners Corporation (Owners) became the owners of the premises at 306 West 100th Street in Manhattan on October 15, 1987 pursuant to a cooperative conversion plan proposed and executed by Westend Property Associates (Westend) as sponsor. Pursuant to the conversion plan Westend retained title to the shares of the corporation and related proprietary leases that remained unsold. On or about March 2, 1989 the unsold shares were sold and assigned

by Westend to an entity known as Diversified Realty Financial Partners Limited Partnership (Diversified). It should be noted that one Jerry Donatelli is the general partner of both Westend and Diversified.

On or about March 6, 1989, Diversified obtained a loan from plaintiff Friesch-Groningshce Hypotheekbank (FGH) in the amount of $12,750,000. Mr. Donatelli, as general partner of Diversified, executed a promissory note for the indebtedness. Donatelli also executed a security agreement, pursuant to which, Diversified pledged the unsold shares of the defendant cooperative corporation, as well as the unsold shares it owned in 16 other cooperative corporations, as security for the loan. At or about the same time the security agreement was executed, the defendant cooperative corporation executed a document denominated a "Recognition Agreement". The document was signed by a principal of FGH and by a principal of the defendant cooperative corporation beneath the words "Agreed To". It was also signed by a representative of Diversified beneath the word "Approved". The document recited that Diversified had pledged its shares of stock in the defendant corporation as security for a loan of $964,522.78; the document did not recite that this amount made up part of the $12,750,000 loan to Diversified. Pursuant to the terms of the agreement the cooperative corporation agreed that it "approved or consented to" the creation by Diversified, as proprietary lessee, of a security in the shares to the extent that such approval was required by the proprietary lease.

The document specifically provided that the cooperative "shall recognize our [FGH's] right as lienor against the Apartment pursuant to the Security [agreement], and, if the Lease be terminated and/or shares cancelled, against the net proceeds of any sale or subletting of the apartment, after reimbursement to you of all sums due you under the Lease." In addition it was provided that "[n]otwithstanding any apparent authority granted to us [FGH] under agreements with the Lessee, WE SHALL HAVE NO RIGHT OR POWER TO TRANSFER THE APARTMENT UPON FORECLOSURE OR OTHERWISE EITHER TO US OR ANYONE ELSE WITHOUT YOUR APPROVAL AS REQUIRED BY THE LEASE, provided, however, that nothing contained herein shall limit any rights we may have to dispossess the Lessee pursuant to law or realize upon our security in accordance herewith".

By letter dated March 27, 1991 FGH notified Diversified that a default had occurred under the terms of the promissory

note and security agreement by virtue of Diversified's failure to pay interest installments due from January 1, 1990 through and including March 1, 1991. The notice also advised Diversified that the entire balance of $12,319,893.80 together with all accrued interest due on the promissory note was accelerated.

Diversified had also failed to make maintenance payments to the defendant corporation commencing in or about September 1989. FGH represents, and it is not disputed, that the defendant notified FGH of the operational problems it was experiencing due to Diversified's failure to honor its maintenance obligations. Further, FGH represents that in October 1989 it commenced making the monthly maintenance payments due in connection with the unsold shares pledged to it by Diversified. While the Recognition Agreement required the cooperative corporation to serve a notice to cure to trigger FGH's obligation to make the monthly payments, it is not disputed that FGH commenced making the payments without the notice being served.

Diversified failed to pay any of the accelerated indebtedness and consequently FGH proceeded to foreclose upon all of the unsold shares pledged by Diversified, including the unsold shares in the defendant cooperative. The foreclosure sale was noticed for May 28, 1991. By letter dated April 30, 1991, FGH notified the cooperative's board of directors of the foreclosure sale and assured the cooperative that the sale would be subject to payment of all outstanding maintenance charges owed by Diversified with respect to the units being auctioned. The letter also stated however that "[o]ther disputes" between the board and Diversified could not be addressed as part of the auction. By letter dated May 22, 1991, the cooperative corporation advised FGH that the corporation had a first lien on the unsold shares held as collateral by FGH, for nonmaintenance obligations relating to renovation and repair work the sponsor was required to complete under the offering plan, but which was left undone. The corporation maintained that it retained the first lien upon the unsold shares for all indebtedness a shareholder might have to the corporation and that this lien was clearly stated in article VI, section 6 of the corporation's bylaws and in a legend printed on each share.

According to the cooperative, the sponsor's outstanding obligations included plumbing, electrical and masonry work, the installation of a new roof and new windows and the repair and refurbishment of the elevator. The total cost of the

renovation and repair work left undone by the sponsor was stated at $781,950.73.

The sale was conducted as noticed on May 28, 1991. ALH Properties Ten, Inc., an affiliate and designee of FGH, was the successful bidder and paid $498,000 for all of Diversified's unsold shares in the defendant cooperative corporation. The defendant cooperative corporation represents that its counsel was present at the auction sale and advised all present that the cooperative corporation had a lien on the shares at auction for the sponsor's indebtedness to the corporation as a shareholder for maintenance and other obligations.

Although ALH contends that it appeared on the designated closing date, and was ready, willing and able to conduct the closing on the shares, no closing ever took place. However it is not disputed that ALH has paid and apparently continues to pay the current maintenance charges to the defendant cooperative corporation as those charges become due.

Plaintiffs originally moved by order to show cause dated October 1, 1991, for a preliminary injunction directing the defendant cooperative corporation to turn over the auctioned shares. After the service of answering papers on the order to show cause the parties stipulated and agreed to convert the preliminary injunction motion to motions by both parties for summary judgment, with supplemental papers to be filed after argument on the motion. The IAS Court denied the defendant's motion for summary judgment and granted plaintiffs' summary judgment motion.

Preliminarily the IAS Court determined that the corporation did not have an "issuer's lien" pursuant to UCC 8-103 on the unsold shares. The court held that shares of stock in a cooperative do not fall within the definition of "security" as contained in UCC article 8. The IAS Court next determined that although plaintiffs properly recognized the cooperative's first lien for maintenance obligations arising by virtue of the proprietary lease, there was nothing in the plain language of the cooperative's bylaws to indicate that the cooperative's lien applies to any claims the corporation may have against the sponsor for nonmaintenance obligations. Therefore, the court concluded that the defendant could not seek to enforce a lien for nonmaintenance obligations against the shares purchased by the plaintiffs at the foreclosure auction.

The IAS Court based its conclusion that shares of stock in a cooperative corporation are not securities for the purposes of

UCC article 8 on *Silverman v Alcoa Plaza Assocs.* (37 AD2d 166), decided by this Court in 1971. In *Silverman (supra),* the plaintiff placed a down payment with the defendant toward the purchase of shares of stock and a proprietary lease in a cooperative apartment. The plaintiff later defaulted on the purchase due to what was described as an " 'uncertain business condition' " *(supra,* at 167). Upon learning that the defendant later sold the shares and proprietary lease to another for the same price as agreed upon with the plaintiff, plaintiff sued to recover the down payment. The defendant moved to dismiss the complaint on the theory that the plaintiff willfuly breached a contract involving the sale of real estate resulting in the forfeiture of the deposit.

In *Silverman (supra,* at 168) it was stated that the "crucial issue presented is whether or not the underlying sale of the stock and proprietary lease in the co-operative apartment was one of realty or personalty". It was properly concluded that the contract at issue involved a sale of personalty, and specifically a sale of goods governed by UCC article 2. The conclusion that UCC article 2 should be applied to determine the amount of damages which could be awarded upon the breach of a contract for the sale of a cooperative apartment has been approved since *Silverman (supra; see, Weiss v Karch,* 62 NY2d 849; *Friedman v Sommer,* 63 NY2d 788). In arriving at its conclusion the Court in *Silverman (supra)* discussed the relationship between article 2 and article 8 and the relevance of article 8 to cooperatives and concluded that the two articles should be read in harmony with each other. The IAS Court in this case based its conclusion, regarding the application of article 8 to shares in a cooperative, upon the portion of the opinion in *Silverman (supra)* in which it was concluded that article 8 was not intended to include shares in a cooperative corporation within its purview.

In *Silverman (supra,* at 170), it was stated:

" 'Goods' are defined in the repealed article 5 (§ 156) of the Personal Property Law as including 'all chattels personal other than things in action and money.' In subdivision 1 of section 2-105 of the Uniform Commercial Code 'goods' are defined as meaning 'all things * * * which are movable at the time of identification to the contract of sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action'.

"It would thus appear that there is no substantial difference

between the definition of goods in the quoted section unless the exclusion of investment securities in section 2-105 of the Uniform Commercial Code constitutes a change. Rather than creating a change, this court believes that the exclusion of 'investment securities' and the definition of 'goods' was an effort to make article 2 and article 8 harmonious rather than mutually exclusive. We believe that the term 'investment securities' as defined in article 8 does not include co-operative apartment stock, that article 8 is to be read in conjunction with article 2, and where article 8 is silent, article 2 is applicable. The official comments upon the Uniform Commercial Code as set forth in McKinney's Consolidated Laws of New York (Book 62½, Part 1) with special reference to pages 96-97 which are pertinent to the case at bar read as follows: ' "Investment securities" are expressly excluded from the coverage of this Article. It is not intended by this exclusion, however, to prevent the application of a particular section of this Article by analogy to securities (as was done with the Original Sales Act in *Agar* v. *Orda,* 264 N. Y. 248, 190 N. E. 479, 99 A. L. R. 269 (1934) when the reason of that section makes such application sensible and the situation involved is not covered by the Article of this Act dealing specifically with such securities (Article 8)'.

"It would thus appear that even if co-operative stock were to be considered as an investment security, the provisions of article 2 would still govern in areas such as the court is presently confronted with when article 8 is silent. However, it would appear that by definition co-operative apartment stock does not fall within the definition of investment securities as set forth in the Uniform Commercial Code."

Uniform Commercial Code § 8-102 provides as follows:

"(1) In this Article unless the context otherwise requires

"(a) A 'certificated security' is a share, participation or other interest in property of or an enterprise of the issuer or is an obligation of the issuer which

"(i) is represented by an instrument in bearer or registered form; and

"(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

"(iii) is either one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations."

While paragraph (b) of UCC 8-102 (1) defines an "uncertificated security" it is clear that if the shares here in issue come within the definition of a "security" for article 8 purposes, they would be "certificated securities", as the shares are represented by an instrument in registered form.

Comment 2 to UCC 8-102 now states that the definitions of the terms certificated security, uncertificated security and security "are functional rather than formal". "At the core is the notion that a security is a share or participation in an enterprise or an obligation that is of a type commmonly traded in organized markets for such interests or is commonly recognized as a medium for investment. The ambit of the definition will change as 'securities' trading practices evolve to include or exclude new property interests." *(Ibid.)* McKinney's New York Annotations go on to note that the term security is defined differently in present New York statutes:

"In General Business Law, § 359-m (f), the 'Uniform Act for Simplification of Fiduciary Security Transfers', the term is stated to include 'any share of stock, bond, debenture, note or other security issued by a corporation which is registered as to ownership on the books of the corporation'.

"The New York 'Blue Sky Law' uses the term to cover 'stocks, bonds, notes, evidences of interest or indebtedness or other securities, including oil and mineral deeds or leases and any interest therein, sold or transferred in whole or in part to the purchaser where the same do not effect a transfer of the title in fee simple to the land, or negotiable documents of title, or foreign currency orders, calls or options therefor * * *' General Business Law, § 352 (1)." (McKinney's Cons Laws of NY, Book 62½, UCC 8-102, at 129.) The New York Annotations conclude by noting that the "Code definition, applicable to Article 8, is broader than the definition in General Business Law, § 359-m (f), narrower than that in General Business Law, § 352 (1), and more nearly in accord with the definition found in *Matter of Waldstein,* 160 Misc. 763, 766-67, 291 N.Y.S. 697, 700 (1936) ('instruments for the payment of money, or evidencing title or equity, with or without some collateral obligation, and which are commonly dealt in for the purpose of financing and investment'.)" *(Ibid.)*

It is clear from the Comment that the UCC allows for the application of article 8 to "new property interests". Since shares in a cooperative corporation are not usually dealt upon securities exchanges, whether or not a share in a cooperative

corporation is to be considered a "security" subject to the provisions of UCC article 8, turns on the question of whether the share is "commonly recognized" in any area in which it is issued "as a medium for investment" (UCC 8-102 Comment 2). In *Silverman (supra)*, the Court did not address this specific issue concentrating instead on the issue before it and more appropriately the applicability of article 2 instead of article 8. Given that this case involves the distinct circumstances in which the unsold shares retained by a sponsor are pledged as collateral, it is evident that analysis under article 8 is more appropriate.

The Court of Appeals has repeatedly characterized the transfer of the shares of a cooperative corporation as a transfer of "securities" *(Weiss v Karch,* 62 NY2d 849, 850, *supra; Friedman v Sommer,* 63 NY2d 788, 789-790, *supra).* Further, shares in a cooperative corporation are specifically included as "securities" under article 23-A of the General Business Law, commonly known as the Martin Act (General Business Law § 352 *et seq.).*

■ While the holding of *Silverman v Alcoa Plaza Assocs. (supra)* regarding the applicability of UCC article 2 to contracts for the sale of cooperative apartments remains valid, it is evident that the conclusion reached in the above-quoted dicta from that case regarding the applicability of article 8 to cooperative stock has little application to this case; and to the extent it can be applied, the conclusion, that article 8 is wholly inapplicable to cooperative stock, has lost its validity over time. Given the obvious and major changes that have taken place with regard to the conversion and ownership of cooperatives since 1971, it is clear that shares of stock in cooperative corporations should now be included within the definition of "securities" within the purview of UCC article 8 particularly where, as in this case, it is clear that the subject shares were purchased and used for no other purpose than investment.

■ It should be noted also that the application of article 8 to determine the relative rights of issuers, owners and creditors with respect to shares in a cooperative corporation is not contrary to application of article 2 in situations such as those presented in *Silverman (supra)* and *Weiss v Karch (supra).* As stated above, this Court in *Silverman (supra)* recognized that article 2 and article 8 are not mutually exclusive and are to be applied harmoniously. If, as stated in *Silverman (supra,* at 170) "where article 8 is silent, article 2 is applicable" then the

converse should also be true, i.e., that where article 2 is silent, article 8 is applicable. Therefore we hold that UCC 8-103 ("Issuer's Lien") should apply to shares of stock in a cooperative corporation if notice of the corporation's lien, or other restraint on transfer of the stock, complies with the requirements of the section.

UCC 8-103 provides that:

"A lien upon a security in favor of an issuer thereof is valid against a purchaser only if

"(a) the security is certificated and the right of the issuer to such lien is noted conspicuously thereon, or

"(b) the security is uncertificated and a notation of the right of the issuer of such lien is contained in the initial transaction statement sent to such purchaser."

UCC 8-204 similarly provides that:

"A restriction on transfer of a security imposed by the issuer even though otherwise lawful is ineffective against any person without actual knowledge of it unless

"(a) the security is certificated and the restriction is noted conspicuously thereon; or

"(b) the security is uncertificated and a notation of the restriction is contained in the initial transaction statement sent to such person."

UCC 1-201 (10) generally defines "conspicuous" as follows: "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." The subdivision further states that "[w]hether a term or clause is 'conspicuous' or not is for decision by the court". Comment 10 following the section points out that the definition is "intended to indicate some of the methods of making a term attention-calling" and that "the test is whether attention can reasonably be expected to be called to it".

UCC 8-204 replaced Personal Property Law § 176, which provided generally that there would be no restriction upon the transfer of shares represented by a stock certificate, by virtue of any bylaw of a corporation or otherwise unless the restriction is stated upon the stock certificate. UCC 8-103 is generally in accord with UCC 8-204 and like that section, substitutes "noted conspicuously" for the words "stated upon" used in Personal Property Law § 176.

*Allen v Biltmore Tissue Corp.* (2 NY2d 534) provides some

guidance with respect to the determination of whether a particular restriction is sufficiently stated on a certificate. The case involved the enforceability of a corporation's first option to repurchase a stockholder's shares in the event of the stockholder's death. The Court's main holding in that case was that the restriction, affording the corporation the right of first option to repurchase the shares at the price it originally received for them, was not an unreasonable restraint. Preliminary to that determination however, the Court addressed the issue of whether the restriction printed on the stock certificate complied with the notice requirement of Personal Property Law § 176, the predecessor to UCC 8-204.

The words printed along the side of the certificate were: " 'Issued subject to restrictions in sections 28, 29, and 30 of the By-laws' " *(supra,* at 538). The plaintiff in *Allen v Biltmore Tissue Corp. (supra)* maintained that the words were not a sufficient statement of the restriction and that the restriction must be set out verbatim or in substance. In concluding that the statement was sufficiently stated on the shares the Court stated: "The plaintiffs maintain that this is not a proper 'statement,' that the restriction must be set out verbatim or in substance. There is no such prescription in the statute, and the courts have found noncompliance only where the stock certificate gives no notice whatever of the restriction sought to be enforced. (See, e.g., *Peets* v. *Manhasset Civil Engineers,* 4 Misc 2d 683; *Security Life & Acc. Ins. Co.* v. *Carlovitz,* 251 Ala. 508, 512-513; *Costello* v. *Farrell,* 234 Minn. 453, 465; *Magnetic Mfg. Co.* v. *Manegold* 201 Wis. 154, 157.) The word 'stated' sanctions a notation indicating where the restriction appears and permits incorporation by adequate reference. In other words, a restriction is sufficiently 'stated' by a legend noting that the stock is 'issued subject to restriction' and specifying where its full text may be found. (See, e.g., *Bloomingdale* v. *Bloomingdale,* 107 Misc 2d 646, 649-650; *Weissman* v. *Lincoln Corp.* [Fla.], 76 So. 2d 478, 483-484 [with the result of which, though not its reasoning, we agree]; *Longyear* v. *Hardman,* 219 Mass. 405, 407; see, also, *Penthouse Properties* v. *1158 Fifth Ave.,* 256 App. Div. 685, 688-689; 12 Fletcher's Cyclopedia Corporations [Perm. ed., 1932], § 5479, p. 277.) In this connection, it is significant that, where the legislature wished the words of a restriction or its substance to be actually printed on the certificate, it used language to express that thought. Thus section 66 of the Stock Corporation Law recites that, 'If a stockholder shall be indebted to the corporation, the

directors may refuse to consent to transfer of his stock until such indebtedness is paid, provided *a copy of this section or the substance thereof is written or printed upon the certificate of stock.'* (Emphasis supplied.)" (2 NY2d, *supra,* at 539-540.)

The securities in this case contain the following legend:

"The rights of any holder hereof are subject to the provisions of the By-laws of 306-100th Street Owners Corp. and to all the terms, covenants, conditions and provisions of a certain proprietary lease made between the person in whose name this certificate is issued, as Lessee, and 306-100th Street Owners Corp. as Lessor, for an Apartment in the premises known as 306 West 100th Street, New York, N.Y., which lease limits and restricts the title and rights of any transferee hereof. The shares represented by this certificate are transferrable only as an entirety and only to an approved assignee of such proprietary lease. Copies of the proprietary lease and the By-laws are on file and available for inspection at the office of the Managing Agent of this Corporation.

"The Directors of this Corporation may refuse to consent to the transfer of the shares represented by this certificate until any indebtedness of the shareholder to the Corporation is paid. The Corporation by the terms of said By-laws and proprietary lease, has a first lien on the shares represented by this certificate for all sums due and to become due under the proprietary lease."

Article VI, section 6 of the bylaws of the defendant cooperative corporation provides in pertinent part as follows: "Section 6. Corporation's Lien: *The Corporation shall at all times have a first lien upon the shares owned by each shareholder for all indebtedness and obligations owing and to be owing by such shareholder to the Corporation arising under the provisions of any proprietary lease issued by the Corporation and at any time held by such shareholder or otherwise arising"* (emphasis added).

■ Initially the legend on the shares states generally that the rights of "any holder" of the shares are subject to the provisions of the bylaws. The legend specifically sets out that the corporation may refuse to transfer the shares until "any indebtedness of the shareholder to the [c]orporation is paid". Further, the legend states that the corporation has a first lien on the shares pursuant to the bylaws and proprietary lease, "for all sums due and to become due under the proprietary lease". Plaintiffs argue that this language, quoted from the

latter portion of the legend, serves only to give notice of a lien for "sums due and to become due under the proprietary lease", i.e. maintenance arrears, and does not sufficiently give notice of a lien for any other indebtedness. Contrary to plaintiffs' argument, we find that the legend taken as a whole sufficiently gives notice of the corporation's first lien and right to refuse to transfer the shares based on the provisions of both the bylaws and the proprietary lease.

Plaintiffs argue that the language of article VI, section 6 of the bylaws and the language of the legend on the shares when read in conjunction with the offering plan and proprietary lease clearly demonstrate that there was no intention expressed therein to impose a lien upon the shares for obligations other than maintenance. Therefore plaintiffs contend that even if an "Issuer's Lien" pursuant to UCC 8-103 is found to exist it could not be applied in connection with the sponsor's nonmaintenance obligations. While plaintiffs maintain that the defendant improperly relies on the language, which states that the corporation's lien extends to "all indebtedness and obligations" of the shareholder both "under the provisions of the proprietary lease" and "otherwise arising", for the imposition of the lien, they do not show that said language or the interpretation urged by the defendant conflicts with the relevant corporate documents.

The offering plan contains the following legend: "The Apartment Corporation has a lien on each shareholder's shares to secure the payment of maintenance charges, assessments and the replenishment of the fund to be maintained by the managing agent to be used as working capital to furnish services for non-purchasing tenants (See 'Obligations of Holders of Unsold Shares' Section) and faithful performance of all other terms and agreements of the appurtenant Proprietary Lease. See Paragraph 32 of Proprietary Lease and Article VI, section 8 of By-Laws." Paragraph 32 of the proprietary lease concerns the lessor's rights after lessee's default in payment of rent and additional rent, the collection of rent from subtenants and the sale of shares by a tenant-shareholder. Article VI, section 8 of the bylaws specifically references the legend contained on the shares quoted above. Neither of those paragraphs conflict with the "otherwise arising" language of article VI, section 6 of the bylaws. Furthermore, review of paragraph 17 of the proprietary lease and the relevant paragraphs of the proprietary lease referenced therein (paragraphs 14, 15 and 16) reveals no provision which conflicts with the interpretation of the rele-

vant corporate documents urged by the defendant. Consequently, reading these corporate documents together, we find that the legend on the shares of the corporation gives sufficient notice of the corporation's lien upon the shares and right to restrict the transfer of the shares, in the event any outstanding indebtedness arising pursuant to the proprietary lease or "otherwise arising" is owed by a shareholder.

The IAS Court concluded that FGH properly recognized the cooperative corporation's first lien for outstanding maintenance. However, it concluded also that the terms of article VI, section 6 in no way impact upon the rights of the parties to the security agreement, and that in any event any other lien which may have been retained is "simply not superior to plaintiffs' secured interest pursuant to the Security Agreement."

The security agreement entered into by plaintiff FGH and Diversified provided in pertinent part as follows: "1. Security Interest in Unsold Shares Borrower hereby pledges, hypothecates, mortgages, assigns and grants to Lender, as security for the payment of the Note and the observance and performance by Borrower of all of the terms, covenants and provisions of the Loan Documents on the part of Borrower to be observed and performed, a first and prior security interest in and to all of Borrower's right, title and interest, now or hereafter acquired, in and to the Unsold Shares, the Proprietary Leases appurtenant and corresponding thereto". While the security agreement states that the borrower gives the lender a first and prior security interest, that interest is "in and to all of *Borrower's* right, title and interest" (emphasis added), in the unsold shares. At the time the security agreement was executed the borrower's (Diversified's) interest in the shares was already subject to the terms of the bylaws, offering plan and proprietary lease. The shares themselves and the bylaws contained adequate notice of the restrictions imposed on the shares and rights retained by the issuer.

The fact that the Recognition Agreement specifically subjected FGH's right to transfer the shares pledged to the corporation's "APPROVAL AS REQUIRED BY THE [PROPRIETARY] LEASE" and failed to mention the lien retained by the corporation pursuant to article VI, section 6 of the bylaws does not alter the fact that the shares were pledged subject to all the provisions of the bylaws. The intent of the Recognition Agreement is plainly to preserve the lender's security interest in the shares and proprietary lease in the event the borrower,

here Diversified, somehow imperils the collateral by defaulting and or breaching the proprietary lease, and the cooperative corporation endeavors to terminate the lease and sell the shares. No such termination occurred in this case. The plaintiff bank notified the corporation of its intention to foreclose and in return the corporation merely notified it of its prior first lien based upon the bylaws. The bank did in fact foreclose upon the shares, which were purchased by its affiliate.

ALH Properties Ten, Inc. as a purchaser of the shares is a shareholder subject to the provisions of the bylaws, as any other purchaser of the shares would be. The bylaws of the corporation constitute a contract between the shareholders and the corporation *(Procopio v Fisher,* 83 AD2d 757, 758). The parties' rights must be adjudicated according to the unambiguous terms thereof and the words and phrases therein must be given their plain meaning. *(Laba v Carey,* 29 NY2d 302, 308.) Pursuant to the bylaws, as well as the other relevant corporate documents, it is clear that the corporation has a lien for the sponsor's outstanding obligations, other than maintenance, to which the shares remain subject even though purchased by the plaintiff at a foreclosure sale.

Plaintiffs' argument that the defendant seeks to impose the obligations of the sponsor upon the foreclosing lender or purchaser of the shares at a foreclosure sale improperly states the situation in this case. This case is distinguishable from *Swartwood v 222 E. 57th St. Owners* (NYLJ, Jan. 31, 1991, at 27, col 1), which plaintiffs maintain is on point. There plaintiffs were tenants-shareholders of the apartment corporation and members of the board of directors who commenced a shareholders' derivative action for declaratory and injunctive relief. The sponsor/holder of unsold shares in that case, who controlled the board, had pledged the unsold shares in return for a loan from Crossland Bank. The sponsor defaulted with respect to a portion of the loan and Crossland issued a notice of default and foreclosure sale of the pledged shares. The plaintiffs sought a preliminary injunction restraining Crossland from selling the shares and proprietary leases and compelling the cooperative to sell all the unsold shares and apply the proceeds to pay all outstanding debts of the sponsor. In addition, plaintiffs sought an attachment of the sponsor's shares and leases. Ultimately plaintiffs sought a declaration that they had priority to the cooperative's claim for maintenance, reserve fund contributions, and repairs, as well as a

declaration that the cooperative should sell the sponsor's shares and receive payment before the bank is repaid.

In denying the motion for the preliminary injunction enjoining the the foreclosure sale, the IAS Court determined that the plaintiffs had not met their burden of proving a likelihood of success on the merits, i.e, that their claims preempted the bank's right to sell the collateral. The court stated that a purchaser in foreclosure buys the shares and proprietary leases and is not transformed into a sponsor. This statement was made in the context of addressing the plaintiffs' contention that the foreclosure should have been stopped because the sponsor might not have complied with the disclosure provisions of the Martin Act and, that if Crossland were to become the owner of the collateral, it would then assume the sponsor's obligations under the Martin Act.

The situation presented by this case is decidedly different. The defendant herein is the cooperative corporation itself; this is not a derivative action. The defendant corporation herein did not move to enjoin FGH's sale of the collateral, did not attempt to retain the shares for sale by the corporation, and does not seek to have the the purchaser in foreclosure assume the duties of the sponsor. The issue herein is the scope of the corporation's lien on the shares, as evidenced by the legend on the shares, the bylaws and the concomitant restriction on transfer in the event the original shareholder has outstanding debts to the corporation.

Moreover the plaintiffs' reliance on the memorandum of the Attorney-General's office, dated October 16, 1991, entitled "Lender Takeover", is inappropriate. The subject of that memorandum was the issue of whether banks or individuals who foreclose on shares pledged as security for a loan have any resultant obligations with regard to the offering plan. The memorandum addresses such issues as whether the lender who forecloses on the shares has any filing obligations pursuant to the General Business Law, whether in the event of a subsequent public offering the lender must comply with the regulatory requirements of a sponsor pursuant to the General Business Law, and whether the lender is responsible for misrepresentations or inaccuracies present in the plan, prior to the lender's foreclosure. That memorandum was not addressed to the relative rights of the purchaser of the shares at a foreclosure sale by the lender and cooperative corporation.

Accordingly, the order of Supreme Court, New York County

(Carol E. Huff, J.), entered on or about June 23, 1992, which, *inter alia*, granted plaintiffs' motion for summary judgment, denied the defendant's motion for summary judgment, declared that plaintiffs have no obligation to defendant for nonmaintenance obligations and enjoined the defendant from refusing to deliver new stock certificates and proprietary leases to plaintiff ALH Properties Ten, Inc. upon the payment of outstanding maintenance due on the unsold shares, is unanimously reversed, on the law, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted; it is declared that the defendant's lien on the unsold shares in the defendant corporation purchased by plaintiffs at a foreclosure sale on or about May 28, 1991 extends to the outstanding nonmaintenance obligations owed by the sponsor to the corporation and is senior to the interests of the plaintiffs, the injunction is vacated, and the matter is remanded for further proceedings consistent herewith, to establish, *inter alia*, the amount of the corporation's lien, with costs.

MILONAS, J. P., ROSENBERGER and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on or about June 23, 1992, unanimously reversed, on the law, with costs, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted; it is declared that the defendant's lien on the unsold shares in the defendant corporation purchased by plaintiffs at a foreclosure sale on or about May 28, 1991 extends to the outstanding nonmaintenance obligations owed by the sponsor to the corporation and is senior to the interests of the plaintiffs, the injunction is vacated, and the matter is remanded for further proceedings consistent with the opinion of this Court entered herein, to establish, *inter alia*, the amount of the corporation's lien.