OPINION OF THE COURT
Louis Grossman, J.
Petitioners move for an order pursuant to CPLR 2304 quashing a subpoena duces tecum which was served upon them, requiring their appearance on September 18, 1978, in the office of the Attorney-General to testify in regard to a matter under investigation.
Michael Gardner (Gardner) is the president of Diamond Resources Corporation (DRC). Gardner contends that DRC is engaged in the business of the outright sale of diamonds to the public, without reservation of any interest, and with a limited right of the purchaser to return any item within five days of its date of delivery. As a result of this, petitioner alleges that the aforesaid subpoena is void and invalid since his business does not constitute and is not involved in the sale, promotion, negotiation, advertisement, distribution or purchase of securities within the meaning as set forth in the subpoena, and that therefore there is no probable cause or authority for the investigation by respondent, and that the request is overly broad in its scope.
Respondent claims that his authority to investigate is set forth in article 23-A of the General Business Law and in subdivision 12 of section 63 of the Executive Law, of the State of New York. With respect to the business of petitioners, respondent concedes that DRC is not registered either with the Securities and Exchange Commission (SEC) or the Department of Law of the State of New York for the purpose of selling securities within their respective jurisdictions. However, respondent asserts that the selling of "investment quality” diamonds in and of itself, does, in fact, constitute the selling of an investment-type item to the public and, as such, is the sale of a security.
Respondent alleges further that certain nefarious activities were practiced by Gardner in relation to these diamond sales, including fraudulently prepared and misleading documents which were designed to defraud the public within and to the State of New York, thereby giving rise to the necessity for this investigation.
*808 The relevant portions of article 23-A of the General Business Law read as follows, in pertinent part:
"§ 352. Investigation by attorney-general.
"1. Whenever it shall appear to the attorney-general, either upon complaint or otherwise, that in the advertisement, investment advice, purchase or sale * * * of any commodity dealt in on any exchange within the United States of America * * * or that in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state, of any stocks, bonds, notes, evidences of interest or indebtedness or other securities, * * * any person, partnership, corporation, company, trust or assistant, or any agent or employee thereof, shall have employed, or employs, or is about to employ any device, scheme, or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise, or * * * shall have employed, or employs, or is about to employ, any deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise, or shall have engaged in or engages in or is about to engage in any practice or transaction or course of business relating to the purchase, exchange, investment advice or sale of securities or commodities which is fraudulent or in violation of law and which has operated or which would operate as a fraud upon the purchaser * * * [which] are hereby declared to be and are hereinafter referred to as a fraudulent practice or fraudulent practices or he [the Attorney-General] believes it to be in the public interest that an investigation be made, he [the Attorney-General] may in his discretion * * * make such special and independent investigations as he may deem necessary in connection with the matter.
"2. The attorney-general, his deputy or other official designated by him is empowered to subpoena witnesses, compel their attendance, examine them under oath before him * * * and require the production of any books or papers which he deems relevant or material to the inquiry”. (Emphasis added.) Also applicable is section 63 of the Executive Law which sets forth the duties of the Attorney-General and authorizes institution of legal proceedings against persons who are conducting a business illegally stating, in pertinent part, as to the preparation of such action, that: "In connection with any such proposed application, the attorney general is authorized to take proof and make a determination of the relevant facts and *809 to issue subpoenas in accordance with the civil practice law and rules.” (Executive Law, § 63, subd 12; emphasis added.) A reading of these sections would appear to clearly indicate that a proper legal basis exists, authorizing the Attorney-General’s issuance of the subpoena in question herein.
Article 23-A of the General Business Law is remedial in nature. As such, the authority of the Attorney-General thereunder is to be liberally construed, in order that the beneficent purpose of the statute may, so far as possible, be attained through its use. (People v Lexington Sixty-First Assn., 38 NY2d 588; People v Federated Radio Corp., 244 NY 33.) The intent of the Legislature in enacting article 23-A of the General Business Law, commonly known as the Martin Act, was the protection of the public in its relations with the business world, specifically in that area concerning the public’s investment of money therein, for the purpose of realizing a profit. This fact was recognized and acknowledged by the Court of Appeals in a decision handed down a few years after the act was first enacted and took effect. The court stated: "The purpose of the law is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited.” (People v Federated Radio Corp., supra, p 38.)
The Legislature, in order to successfully effectuate the purpose of the statute, therefore made the investigative authority granted to the Attorney-General under the Martin Act extremely broad in its scope and, also, made establishing a basis for its use relatively uncomplicated. (See Matter of Attorney-General of State of N. Y. [Amer. Research Council], 10 NY2d 108, mot for adjournment of argument den 9 NY2d 965, mot to amd remittitur granted 10 NY2d 810, cert den 368 US 947; Dunhan v Ottinger, 243 NY 423; People v Cadplaz Soonsors, 69 Misc 2d 417.)
Petitioner asserts, however, even after taking into consideration the underlying nature and purpose of the Martin Act, that in order for a subpoena to issue under the act, the Attorney-General must show that it was issued in good faith upon probable cause for investigation, that the materials asked for bear a reasonable relationship to matters under investigation, and that these matters are properly within the investigative jurisdiction of the statute.
Although it is true that the courts will usually find a basis *810 for the exercise of this investigative authority by the Attorney-General (such a basis exists at this point for purpose of discussion), it is still the general rule that, as a precondition for the issuance of an office subpoena by the Attorney-General, under the investigative authority granted to him by statute, there must exist a subject matter jurisdiction on which the issuance can rest. (Matter of Sussman v New York State Organized Crime Task Force, 39 NY2d 227.) It is not within the power of the Legislature to confer upon the Attorney-General, or any executive of the State, " 'an arbitrary and unbridled discretion as to the scope of his investigation’ ”. (Matter of A’Hearn v Committee on Unlawful Practice of Law of N. Y, 23 NY2d 916, 918.) Thus, the Attorney-General may exercise discretion in the use of his investigative authority only in those areas where he has such authority prescribed by statute, and then only within bounds circumscribed by a reasonable relationship between that which is subpoenaed and its bearing on the subject matter under investigation and the public benefit sought to be achieved. (See Matter of Napatco v Lefkowitz, 57 AD2d 742; Matter of Temporary State Comm, on Living Costs & Economy v Bergman, 80 Misc 2d 448.)
Under the assumption that the Attorney-General does have the basis for the exercise of his authority within the scope of the Martin Act, enabling him to investigate the petitioners and their activities in regard to the sale of diamonds, the question exists as to whether the subpoena in the instant action conforms to the legal principles above stated, and was therefore validly issued for the purpose stated.
As to the petitioner’s claim that there is no probable cause for the investigation conducted by the Attorney-General and that the testimony and documents sought by the subpoena go beyond that which might bear a reasonable relationship to the matters under investigation, the respondent’s affidavit in opposition to the instant motion cites various alleged activities of the petitioners as the basis for his requests. Some of thses alleged activities include the sale of "diamonds” which are actually zirconium stones; the use of fraudulent documents to induce sales of "investment quality” diamonds; forged signatures, descriptions and appraisals on illicitly obtained forms; the use of high pressure phone solicitations to obtain sales; false representations made to prospective purchasers that the diamonds for sale were priced slightly above wholesale; and the fact of a prior Federal conviction for *811 the fraudulent sale of investments to the public of the individual petitioner herein.
These allegations, which the Attorney-General states are based on evidence, are sufficient to meet any test of good faith to which the respondent might be put, and the material requested certainly bears a reasonable relationship to the subject matter under investigation. Probable cause for the issuance of the subpoena in question is clearly within the authority granted to the Attorney-General by statute for the purpose of conducting investigations. As was stated by the Court of Appeals in Matter of LaBelle Creole Int., S. A. v Attorney-General of State of N. Y. (10 NY2d 192, 198): "As long as that official [Attorney-General] has reasonable basis for believing that the corporation violated a New York statute, he is not prevented by the due process clause of the Federal Constitution from exercising his powers of subpoena and iniating an investigation designed to ascertain the facts.”
Having determined that the subpoena herein is valid insofar as there is probable cause for the investigation and that the request is not too broad in scope as to the testimony and materials asked for, the basic question remains as to whether or not there exists any reasonable relationship between the jurisdiction of the respondent and the activities of either petitioner. The only issue is did the petitioners engage in "the issuance, sale, promotion, negotiation, advertisement, distribution or purchase of securities”, within the meaning of the subpoena herein and the provisions of the Martin Act.
Petitioners contend that they are only engaged in the outright sale to the public of diamonds and that these sales cannot be deemed to be a sale of securities in any sense of the word, but are simply exchanges of personal property for a purchase price.
There is no dispute that section 352 of the General Business Law grants to the Attorney-General the authority to investigate the sale of securities and similar instrumentalities to the public. The Attorney-General fulfills in New York the same administrative function as does the Securities and Exchange Commission in the Federal Government. Also, no argument exists on the fact that the Attorney-General’s jurisdiction is limited in scope by the Martin Act basically to the investigation of security frauds. However, as heretofore stated, the power of the Attorney-General under article 23-A of the General Business Law (Martin Act) is exceedingly broad and *812 grants a wide discretion to the Attorney-General in determining whether an inquiry is warranted into the sale of securities within New York State. (See Greenthal & Co., v Lefkowitz, 41 NY2d 818, affd 32 NY2d 457.) One of the reasons for such an inquiry is to adequately develop a factual basis for a determination by the Attorney-General as to whether or not the subject being investigated comes within the scope of his authority within the Martin Act.
A legal definition of the word "security” is not easily ascertained. The only statutory definition, found in section 8-102 of the Uniform Commercial Code, is too narrow to be used elsewhere. The court, in Matter of Waldstein (160 Misc 763, 767), said that: "[A]ny form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investiment, is a security”. Petitioners argue that no instrument is delivered to the purchaser in this case, which is intended to represent any investment, but rather the item of property itself is delivered. Also, petitioners state that the fact that an item is considered by some to be a form of investment does not necessarily lead to the conclusion that the parties herein are involved in an "investment contract” and therefore a security, within the meaning intended under the provisions and regulations of both the Martin Act and the Securities and Exchange commission.
Although the petitioners believe that it is crystal clear that the subject matter of sales by Diamond Resources Corporation are in the same nature as the sale of any item of personal property, and that the fact that a diamond may often times have value as an investment does not change the nature of the transaction, it is also true that the manner in which an item is sold and presented to the buying public is very often a factor, if not the major one, in determining the nature of the relationship between the seller and the purchaser of an item.
The Martin Act (New York State) and the Securities Acts of 1933 and 1934 (Federal) are virtually identical in their design and scope, and the purpose for which they were enacted. Both are intended to be used in the prevention of the various kinds of deceptive practices and fraudulent schemes which have developed side by side with the growth of the securities industry. Both the Martin Act with its related provisions, and the Securities Act with its related provisions, in order to be effective in providing a remedy to those who have fallen prey to the exploitation of the public by unscrupulous individuals, *813 must not be strictly interpreted but should be given a pliable yet resilient construction enabling them to be applied to individual situations in a manner which best fulfills their beneficial purpose. Given a degree of flexibility, the Attorney-General and the Securities and Exchange Commission can effectively enforce each law through regulations in keeping with their underlying purpose. (See People v Abbott, 4 Misc 2d 565; People v Federated Radio Corp., 244 NY 33, supra; Securities & Exch. Comm, v Capital Gains Bur., 375 US 180, 195; accord Affiliated Ute Citizens v United States, 406 US 128, 151.) Thus, the United States Supreme Court noted the fact that the meaning of "securities” encompassed a variety of legal concepts within its scope, when in a discussion of what the Securities Acts applied to, it stated: "[T]he reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached” (Securities & Exch. Comm, v Joiner Corp., 320 US 344, 351).
Petitioners’ contention that their sale of "investment quality” diamonds, in and of itself, does not make such dealings into investment contracts is true. However, regardless of the nature of the ultimate sales herein, an investment contract is not determinable only by the nature of what the sellers actually sell but equally by "what character the investment is given * * * by the terms of offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters’ offerings be judged as being what they were represented to be.” (Securities & Exch. Comm, v Joiner Corp., supra, pp 352-353.) It is clear that the diamonds here were meant to be purchased for investment, i.e., for making a profit and not for collection. They are described to the public as an investment and that is the thrust of the purchase.
A definition of an investment contract which has been accepted for use by the Federal courts is that it usually is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party”. (Securities & Exch. Comm, v Howey Co., 328 US 293, 298-299.) Although the activities of the petitioners would not at first seem to fall within the scope of this definition, an examination of the facts, and the activities alleged by the Attorney-General, reveal otherwise.
*814 The facts herein disclose that the petitioners stimulate sales by advertisements in selected media publications and other familiar commercial outlets, and by making "cold calls” on the telephone, using phone books selected from distant cities from New York State, at random. Upon a showing of interest by a potential customer, petitioner mailed to him or her an advertising brochure containing detailed descriptions of the procedures involved in the purchase of "investment quality” diamonds and of the "special services” given to their customers.
Petitioners do not deny that the diamonds it sold were promoted as an investment and a safeguard against inflation. Its advertising consistently described purchases as an investment. In the Joiner and Howey cases (supra), the United States Supreme Court considered investment-oriented advertising to be a factor in finding the existence of an investment contract. In Glen-Arden Commodities v Constantino (493 F2d 1027, 1034-1035) the court in discussing the advertising factor stated: "It ill behooves appellants, after enticing their customers with fancy brochures touting their investment plan, now to claim there was no investment plan but the mere sale of an unadorned commodity.”
Petitioners contend that there is no way in which their sale of diamonds can be seen as a common enterprise in which purchasers participate. Although most often these enterprises consist of the sale of shares in a fund, it may also be said that a common enterprise exists where the interests of the purchasers are the same. A significant question is whether "those essential managerial efforts which affect the failure or success of the enterprise” are more significant than those of the investors. (Securities & Exch. Comm, v Turner Enterprises 474 F2d 476, 482.) This is clearly the case herein. Petitioners’ knowledge of the diamond field and the quality and value of those diamonds which were offered were relied on by the purchasers.
Petitioners finally point out that it was not the efforts solely on the part of the promoters which were to lead to a realization of profits by the investor or purchaser. However, in Securities & Exch. Comm, v Turner Enterprises (supra, p 482), the court said that "the word 'solely’ should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in *815 substance, if not form, securities.” This was in keeping with construing the law flexibly so as to carry out the intent of the Legislature.
Here the petitioners are emphatically trusted with the work and expertise of producing a payoff. Petitioners prepared expensive mailing pieces showing the public how the market price of diamonds has consistently risen while the American dollar declines. Customers were also advised of how diamonds are a hedge against inflation. These facts persuade the court that dependence of the investor on the expertise of the seller to produce the expected profit is present here. A recent case in the United States District Court for the Southern District of New York, Securities & Exch. Comm, v Brigadoon Scotch Distr. Co. (480 F2d 1047), is cited by the respondent as being precisely similar to the instant case. The court finds that it must agree. Although, the facts of that case involved the sale of valuable coins, "rare” Scotch, etc., the underlying factual pattern is basically the same as herein. There the District Court found that despite protestations by the defendants to the contrary, an investment contract existed and the Securities and Exchange Commission had the right to involve itself. (See, also, People v Monex Int., 86 Misc 2d 320 [a similar New York State Supreme Court case involving marginal purchasing].)
Accordingly, petitioners’ application requesting the subpoena issued by the Attorney-General be quashed is denied.
Settle order.