460 F.3d 308
 HIGHLAND CAPITAL MANAGEMENT LP, Plaintif-Appellant-Cross-Appellee,
v.
Leonard SCHNEIDER, Leslie Schneider, Scott Schneider, and Susan Schneider, Defendants-Third-Party-Plaintiffs-Counter Defendants-Appellees-Cross-Appellants,
Jenkens & Gilchrist Parker Chapin LLP, Defendant-Appellee,
RBC Dominion Securities Corp., Third-Party-Defendant-Counter-Claimant-Cross-Appellee.
 Docket No. 05-4729-cv(L).
 Docket No. 05-4869-cv(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: June 15, 2006.
 Decided: August 15, 2006.
 
 1
 Paul B. Lackey (Jamie R. Welton, on the brief), Lackey Hershman L.L.P., Dallas, TX, for Highland Capital Management LP.
 
 
 2
 Alvin M. Stein (Katherine C. Ash and Tyler D. Lenane, on the brief), Troutman Sanders LLP, New York, NY, for Leonard, Leslie, Scott, and Susan Schneider.
 
 
 3
 Robert B. Gilbreath, Jenkens & Gilchrist Parker Chapin LLP, Dallas, TX, for Jenkens & Gilchrist Parker Chapin LLP.
 
 
 4
 Before WINTER and RAGGI, Circuit Judges, and CROTTY, District Judge.[1]
 
 
 5
 CROTTY, District Judge.
 
 
 6
 Plaintiff-Appellant Highland Capital Management LP ("Highland") appeals from a judgment of the United States District Court for the Southern District of New York (Peter J. Leisure, Judge) dismissing counts one through seven of its complaint against Defendants-Appellees Leonard Schneider, Leslie Schneider, Scott Schneider, and Susan Schneider (collectively, the "Schneiders"). While Highland appeals the district court's dismissal of all counts, we dispose of counts three through six in a separate summary order. This decision deals only with the narrow question of whether the promissory notes issued by McNaughton Apparel Group, Inc. ("McNaughton") to the Schneiders fall within the definition of a "security" in Section 8-102(15) of the New York Uniform Commercial Code ("U.C.C."), and therefore are exempt from application of the New York statute of frauds, N.Y. U.C.C. § 1-206(1). The district court found that the notes were not "securities." Recognizing the lack of clarity in New York law regarding what constitutes a "security" under Section 8-102(15) of the New York U.C.C., and the importance of this question to the financial community, we certify the question to the New York Court of Appeals. We retain jurisdiction over counts one, two and seven of Highland's Third Amended Complaint—Highland's three contract-based claims—so that, upon receipt of the New York Court of Appeals' answer, we may rule on the remainder of Highland's appeal.
 
 BACKGROUND
 
 7
 The underlying facts of the dispute between Highland and the Schneiders are set out in great detail in the district court's Opinion and Order dated July 25, 2005. See Highland Capital Mgmt. L.P. v. Schneider, No. 02-8098, 2005 WL 1765711, at *4, 2005 U.S. Dist. LEXIS 14912, at *8-28 (S.D.N.Y. July 26, 2005). Since we assume familiarity with the district court's decision, we provide here only a brief summary of the facts relevant to the question of whether the subject promissory notes are securities under the New York U.C.C. Like the district court, we construe the facts in the light most favorable to plaintiff, although we recognize the Schneiders' sharp disagreement with many of the allegations advanced.
 
 
 8
 A. Issuance of the Promissory Notes to the Schneiders
 
 
 9
 The Schneider defendants owned and operated two apparel companies, Jeri-Jo Knitwear and Jamie Scott, Inc. (collectively "Jeri-Jo"). On April 15, 1998, the Schneiders sold Jeri-Jo to McNaughton. McNaughton paid $55 million, assumed debt worth $10.9 million, and promised to pay an earn-out payment based on Jeri-Jo's performance over the next two years.
 
 
 10
 Owing to Jeri-Jo's success in this two-year period, McNaughton owed the Schneiders approximately $190 million in earn-out profits. Originally, the earn-out payments were to be in cash or stock. As a result of McNaughton's poor financial condition at the time the earn-out payments came due, however, McNaughton and the Schneiders agreed that part of the payment would be issued in the form of promissory notes. The parties negotiated and agreed to a total earn-out payment of $161 million, with the Schneiders receiving the following combination of cash, stocks and notes: (1) $95 million in cash upfront; (2) $30 million in cash after McNaughton received new financing; (3) $26 million in McNaughton common stock; and (4) $10 million in four three-year promissory notes.[2]
 
 
 11
 As the deadline for the $30 million cash payment approached in November 2000, McNaughton asked for an extension until April 2001. The Schneiders declined McNaughton's request for an extension, and instead accepted four additional promissory notes with a total face value of $59 million in lieu of the $30 million cash payment. This second set of promissory notes was issued on December 1, 2000.[3]
 
 
 12
 All eight notes were stamped "subordinated promissory note," as they were subordinate to senior creditors and were convertible to stock if McNaughton ever dissolved.[4] The Notes were payable to the individual Schneider to whom the money was owed, not to a generic bearer, but were fully transferrable as long as McNaughton complied with the registration requirements of the Securities Act of 1933.[5] The Schneiders' ability to find a suitable buyer for the notes was limited, however, by the fact that all of the promissory notes were considered high-risk debt due to the uncertainty about McNaughton's ability to pay them off. All notes indicated that they were to be "governed by and construed in accordance with" New York law.
 
 
 13
 B. Potential Sale of Promissory Notes by the Schneiders
 
 
 14
 7 In late 2000 and early 2001, the Schneiders decided to price the notes. They engaged Glen Rauch, a broker-dealer acting through his company Glen Rauch Securities, Inc. ("Rauch"), for this purpose. Rauch, in turn, engaged RBC Dominion Securities Corp. ("RBC") as an agent and exclusive broker for the purpose of marketing the notes. RBC was to act as a "riskless principal" in the deal, meaning that RBC agreed it would purchase the notes from the Schneiders (through Rauch) and then "flip" the notes by selling them to a third-party purchaser at a premium. As a "riskless principal," RBC would not actually "purchase" the notes until the third-party end-purchaser was already lined up and ready to complete the final purchase, so that RBC would not assume any risk in the transaction. In this sense, RBC would be both a seller and a buyer in the deal, an arrangement common in the financial world.
 
 
 15
 Sometime in January 2001, RBC found a buyer for the notes, Plaintiff Highland, and negotiations between RBC and Highland over price ensued. Highland allegedly agreed to purchase $45.4 million worth of the notes at a price of 52.5 cents on the dollar.[6] On March 14, 2001, Rauch allegedly informed RBC that the Schneiders had agreed to the transactions, and the parties entered an oral agreement to carry out the trade.[7] As is customary in the financial industry, these negotiations were telephonically recorded, rather than memorialized on paper. These recordings allegedly reflect that throughout the course of negotiations, all parties considered the notes to be "tradeable securities," which could be sold only by a broker-dealer with an applicable securities license to a buyer who qualified as an "accredited investor."
 
 
 16
 On or about March 9, 2001, the Schneiders allegedly learned that Jones Apparel Group ("Jones") intended to acquire McNaughton, an acquisition that would require the eight notes to be paid in full. Based on this information, the Schneiders decided not to sell the notes, and therefore refused to settle the trade with Highland. Three weeks later, Jones's acquisition of McNaughton was announced to the public, and the Schneiders' notes were paid off in full.[8]
 
 C. Procedural History
 
 17
 On October 18, 2001, Highland brought suit against the Schneiders in Texas state court for breach of contract, tortious interference with contractual relations, and third-party beneficiary breach of contract.[9] The Schneiders removed the case to the Northern District of Texas based on diversity of citizenship under 28 U.S.C. § 1332(a), and the case was later transferred to the Southern District of New York. After transfer, the Schneiders answered, denying that they ever made an agreement with Highland to sell the notes and asserting, among other things, a defense of the statute of frauds.
 
 
 18
 At the close of discovery, the Schneiders moved for summary judgment and judgment on the pleadings to dismiss Highland's claims against them. The district court granted Defendants' motions for summary judgment and judgment on the pleadings, dismissing counts one through six of Highland's complaint on the merits pursuant to Federal Rules of Civil Procedure 12(c) and 56, and dismissing count seven of Highland's complaint for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and Federal Rule of Civil Procedure 12(b)(1). Highland now appeals.
 
 DISCUSSION
 I. ISSUE RAISED IN THIS APPEAL
 
 19
 While Highland raises a number of issues on appeal, this decision addresses only the narrow and highly specific issue of whether the eight promissory notes issued by McNaughton to the Schneiders are "securities" as the term is defined in Section 8-102(15) of the New York U.C.C. This question is directly relevant to our review on appeal, as it determines whether the alleged oral agreement to sell the notes in March 2001 is subject to the New York statute of frauds, N.Y. U.C.C. § 1-206(1).[10] If the statute of frauds applies, then this court may well lack subject matter jurisdiction to review the district court's dismissal of Highland's contract-based claims. If the statute of frauds does not apply, then this Court would have to address the serious possibility that the district court's dismissal of these claims was in error.
 
 
 20
 A. Section 8-102(15) of the New York Uniform Commercial Code
 
 
 21
 The current version of the New York U.C.C. defines a "security" as:
 
 
 22
 [A]n obligation of an issuer or a share, participation, or other interest in an issuer . . .
 
 
 23
 (i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;
 
 
 24
 (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and
 
 
 25
 (iii) which . . . is, or is of a type, dealt in or traded on securities exchanges or securities markets . . . .
 
 
 26
 N.Y. U.C.C. § 8-102(15) (emphasis added).
 
 
 27
 B. The District Court's Analysis of the Schneiders' Notes Under Section 8-102(15)
 
 
 28
 The district court held that the Schneiders' promissory notes were not "securities" under Section 8-102(15) of the New York U.C.C. because the notes were neither "represented by a security certificate in bearer or registered form," nor "registered upon books maintained for [the purpose of recording transfer] by or on behalf of the issuer," as required under subsection (i) of the definition. The district court said the notes were "not represented by a certificate," because they were "signed by the maker, McNaughton, and represented as a note of payment due." See Highland, 2005 WL 1765711, at *14, 2005 U.S. Dist. LEXIS 14912, at *44.
 
 
 29
 Neither the plain language of the statute nor the accompanying commentary are clear about what constitutes a "certificate" for U.C.C. purposes. The New York U.C.C. defines a "security certificate" in a rather circular fashion, as "a certificate representing a security." N.Y. U.C.C. § 8-102(16). There are two possible meanings: either "certificate" refers to a specialized document, e.g., the paper certificates that have traditionally been used to represent stocks, or "certificate" refers to any paper used to embody the underlying intangible interest. See N.Y. U.C.C. § 8-102(16) & cmt n. 16. If the term "certificate" refers to the latter, then the promissory notes, each of which is evidenced by a twelve-page writing, would meet the definition of "certificate"; if the term "certificate" refers to the former, i.e., a specialized document such as a stock certificate, then it is correct to find that the Schneiders' notes are "not represented by a certificate." There is no New York case law clarifying what constitutes a "certificate" for purposes of Section 8-102.
 
 
 30
 Assuming the district court is correct that the Schneiders' notes are "not represented by a certificate," then the notes must be analyzed under the second clause of subsection (i), which addresses "uncertificated securities." See N.Y. U.C.C. § 8-102 cmt. n. 15 (explaining that subsection (i) is structured in the alternative, so that an interest or obligation is a "security" if "the issuer either maintains transfer books or the obligation or interest is represented by a certificate in bearer or registered form" (emphasis added)); see also N.Y. U.C.C. § 8-102(18) (defining an "uncertificated security" as "a security that is not represented by a certificate"). The second clause of subsection (i) provides that an uncertificated obligation or interest is a "security" only if "the transfer of [the obligation or interest] may be registered upon books maintained for that purpose by or on behalf of the issuer." N.Y. U.C.C. § 8-102(15)(i) (emphasis added). Applying this language, the district court found that "there [was] no evidence that the transfer is registered on `books maintained for that purpose by or on behalf of the issuer,'" and therefore the notes could not be "securities" as a matter of law. See Highland, 2005 WL 1765711, at *13, 2005 U.S. Dist. LEXIS 14912, at *44-46.
 
 
 31
 We are not certain that the district court's analysis was correct. Subsection (i) does not require that transfer of the obligation or interest actually be registered on books maintained for that purpose, as the district court's opinion suggests, but only that they may be registered on such books. Therefore, we believe that the proper inquiry is whether the notes could have been registered on transfer books maintained by McNaughton, not whether they were registered on transfer books at the time of the litigation.
 
 
 32
 Moreover, some record evidence suggests that the Schneiders' notes may have been registered on transfer books. Specifically, each note contained a restrictive legend providing that the notes could "not be transferred in the absence of an effective registration statement" or an "opinion of counsel to the maker that such registration is not required." (J.A. A-520, A-532, A-544, A-558, A-569, A-580, A-591, A-602.) Registration for the purpose of the Securities Act of 1933, as the restrictive legend requires,[11] is not the same as registration on the books of the corporation for purposes of transfer, as the New York U.C.C. definition of a "security" requires. The existence of the restrictive legend suggests, however, that McNaughton would have had to monitor the notes in some manner, in order to ensure compliance with the registration requirements indicated in the legend. Such monitoring is usually done through the use of transfer books. Thus, even if McNaughton chose not to maintain separate books to monitor the transfer of the Schneiders' notes, McNaughton could have — and perhaps should have — maintained such books.
 
 
 33
 Further, each Note required that McNaughton make substantial quarterly principal payments and monthly interest payments at 9-3/4% to each of the holders. These payments were recorded on the books of the corporation. As Highland points out, the continued existence of these payment obligations suggests that McNaughton would have had to record the transfer of the notes on special transfer books in order to identify the holders to whom these payments were due. Thus, transfer of the promissory notes may have been registered upon books maintained for that purpose by or on behalf of McNaughton.
 
 
 34
 The drafters' use of the words "may be" is explained perhaps by Section 8-401 of the New York U.C.C., entitled "Duty of Issuer to Register Transfer." Section 8-401 provides that "[i]f a certificated security in registered form is presented to an issuer with a request to register transfer or an instruction is presented to an issuer with a request to register transfer of an uncertificated security, the issuer" must register the transfer as long as certain requirements are met. Reading subsection (i) of Section 8-102(15) in light of Section 8-401, the phrase "may be registered" in Section 8-102(15)(i) likely means that the obligation or interest is of the type that Section 8-401 requires the issuer to register, if instructed to do so. Thus, contrary to the Schneiders' suggestion in their opposition brief, giving effect to the term "may be" does not necessarily mean that it will be "limitless" in scope. See Appellee's Br. 43. We recognize, however, that neither the New York U.C.C. nor the New York courts have defined the contours of subsection (i), and therefore whether the Schneiders' notes meet the first prong of the tripartite test for a "security" under the New York U.C.C. remains unresolved.
 
 
 35
 Since the District Court found that the notes do not meet the first prong of Section 8-102(15), it did not analyze whether the notes meet the second and third prongs. We believe that they do. The question of whether the Schneiders' notes were "of a class or series" is answered by the terms of the notes themselves. In total, McNaughton issued eight notes: 4 notes in August 2000, and 4 notes in December 2000. As such, the notes are clearly divisible into "a class or series," so the second prong of Section 8-102(15) is satisfied. See, e.g., Baker v. Gotz, 387 F.Supp. 1381, 1390 (D.Del.1975) (finding that a note was "patently `one of a class or series'" where six notes were issued, five in the amount of 4,000,000 Swiss francs and the sixth in the amount of 5,360,000).
 
 
 36
 While the Schneiders' notes were not actually traded on a securities exchange or securities market, they were "of a type" dealt in securities exchanges or markets. See, e.g., In re Domestic Fuel Corp., 70 B.R. 455, 462 (Bankr.S.D.N.Y. 1987) (noting that "whether or not there is a market for the particular instrument is not the controlling factor, if the instrument is `of a type commonly dealt in upon securities exchanges or markets'" (quoting Practice Commentary accompanying Section 8-102)); Baker v. Gotz, 387 F.Supp. at 1390 (same). Support for this position may be found in the record itself. In a recorded conversation between James Alterbaum, a partner at Jenkins Gilchrist Parker Chapin, the law firm representing the Schneiders, and Ken Ambrecht, a broker at RBC, Alterbaum allegedly referred to the notes as "freely tradeable securities." (J.A. A-914.) Glen Rauch, a broker-dealer, also referred to the notes as "tradeable securities" and stated that he "wouldn't even think of trading without an applicable securities license. (J.A. A-914, A-1422 to A-1427.) Moreover, the fact that the Schneiders retained securities professionals to sell the notes, and these professionals found willing buyers for the notes, demonstrates that the notes are "of the type dealt in or traded on securities . . . markets." Therefore, the third prong of Section 8-102(15) is satisfied.
 
 
 37
 II. CERTIFICATION TO THE NEW YORK COURT OF APPEALS
 
 
 38
 4 The parties do not dispute that New York law governs this diversity action. We review de novo the district court's interpretation of New York law. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Where, as here, the New York Court of Appeals has not yet spoken on the issue before the Court, we must either (1) predict how the New York Court of Appeals would resolve the question, or (2) certify the question to the New York Court of Appeals for a definitive resolution. See 2d Cir. R. § 0.27 (permitting us to certify "to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case"); N.Y. Comp.Codes R. & Regs. tit 22, § 500.27(a) (authorizing certification of "determinative questions of New York law . . . for which no controlling precedent of the [New York] Court of Appeals exists"); Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 530-31 (2d Cir. 2006); DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir. 2005).
 
 
 39
 We resort to certification sparingly, mindful that "it is our job to predict how the [New York Court of Appeals] would decide the issues before us." See DiBella, 403 F.3d at 111 (quoting Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 370 (2d Cir.1999)). Therefore, we do not certify questions of law "where sufficient precedents exist for use to make [a] determination." Id. Where a "statute's plain language does not indicate the answer," however, certification is permissible. Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 51 (2d Cir. 1992); accord McGrath v. Toys "R" Us, Inc., 356 F.3d 246, 250 (2d Cir.2004). In determining whether to certify a question, we consider three primary issues: "(1) the absence of authoritative state court interpretations of the state statute; (2) the importance of the issue to the state, and whether the question implicates issues of state public policy; and (3) the capacity of certification to resolve the litigation." Morris, 445 F.3d at 531 (internal citations and quotation marks omitted). After careful consideration of these factors, we believe that certification is appropriate in this case.
 
 
 40
 A. Is this an Unsettled Area of New York Law?
 
 
 1. New York Court of Appeals
 
 
 41
 While there is "scant caselaw" emanating from the New York courts on what constitutes a "security" under Section 8-102 of the New York U.C.C., we are not entirely without guidance. The New York Court of Appeals has stated that "[A]rticle 8 of the Uniform Commercial Code . . . governs stocks, bonds and other evidences of indebtedness." Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso, 87 N.Y.2d 36, 43, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995). Other than reciting the language of Section 8-102(15), however, the Court of Appeals did not elaborate in Vigilant Insurance on what "other evidences of indebtedness" constitute "securities" for purposes of the New York U.C.C. The Court of Appeals has never addressed the specific question of whether promissory notes are — or in certain defined circumstances can be — "securities" under the New York U.C.C. Therefore, there is no controlling precedent on this issue.
 
 
 2. Lower New York courts
 
 
 42
 The Appellate Division, First Department has recognized that promissory notes are undoubtedly "securities" for purposes of the Martin Act, New York's counterpart to the Securities and Exchange Acts of 1933 and 1934. See ALH Props. Ten, Inc. v. 306-100th St. Owners Corp., 191 A.D.2d 1, 9, 600 N.Y.S.2d 443 (1st Dep't 1993) (reciting the definition of a "security" for purposes of the Martin Act, N.Y. Gen. Bus. L. § 352); see also N.Y. Gen. Bus. L. § 352 (including in the definition of a "security" any "note" or "evidence of indebtedness"); 15 U.S.C. § 77b(1) (same). The First Department cautioned, however, that the statutory definition of "security" contained in Section 8-102(15) of the New York U.C.C. is not identical to the term "security" as used in the context of federal and state securities regulation or other New York statutes:
 
 
 43
 "In General Business law, § 359-m (f), the `Uniform Act for Simplification of Fiduciary Security Transfers', the term ["security"] is stated to include `any share of stock, bond, debenture, note or other security issued by a corporation which is registered as to ownership on the books of the corporation'.
 
 
 44
 "The New York `Blue Sky Law' uses the term to cover `stocks, bonds, notes, evidences of interest or indebtedness or other securities, including oil and mineral deeds or leases and any interest therein, sold or transferred in whole or in part to the purchaser where the same do not effect a transfer of the title in fee simple to the land, or negotiable documents of title, or foreign currency orders, calls or options therefor . . .' General Business Law, § 352(1)." (McKinney's Cons Laws of NY, Book 62 ½, UCC 8-102, at 129.) The New York Annotations conclude by noting that the "Code definition, applicable to Article 8, is broader than the definition in General Business Law, § 359-m (f), narrower than that in General Business Law, § 352(1), and more nearly in accord with the definition found in Matter of Waldstein, 160 Misc. 763, 766-67, 291 N.Y.S. 697, 700 (1936) (`instruments for the payment of money, or evidencing title or equity, with or without some collateral obligation, and which are commonly dealt in for the purpose of financing and investment'.)" (Ibid.)
 
 
 45
 Id. at 9, 600 N.Y.S.2d 443; accord Gardner v. Lefkowitz, 97 Misc.2d 806, 812, 412 N.Y.S.2d 740 (N.Y.Sup.Ct., N.Y.Co.1978). The definition of a "security" articulated in In re Waldstein, and adopted by the First Department in ALH Properties as the definition of a "security" for purposes of Article 8 of the New York U.C.C., is broad enough to encompass the Schneiders' promissory notes. Similarly, the New York County Supreme Court, Appellate Term, observed in Cohn, Ivers & Co. v. Gross, that "any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security" for purposes of the New York U.C.C. See 56 Misc.2d 491, 494, 289 N.Y.S.2d 301 (N.Y.App. Term, 2d & 11th Dist.1968). A promissory note fits that definition. Other than these few cases, however, no New York have endeavored to define what constitutes a "security" for purposes of the New York U.C.C.
 
 
 46
 
 3. Federal courts interpreting the U.C. C.
 
 
 
 47
 The few federal cases on this issue support the conclusion that the U.C.C. definition of a "security" includes notes of the type held by the Schneiders. In Baker v. Gotz, for example, the Delaware District Court expressly held that three subordinated promissory notes issued by Delaware corporations were "securities" under Section 8-102 as it existed in both Delaware and New York at the time.[12] See 387 F.Supp. at 1389-90. Like the promissory notes in our case, the notes analyzed in Baker v. Gotz were subordinated notes issued by large corporations and payable to specific entities named on the notes. See id. at 1385-86. While the court in Baker v. Gotz reviewed the notes to determine if they were attachable in Delaware, rather than to determine if an oral agreement for sale of the notes was barred by the statute of frauds, there is no indication in the U.C.C. or the case law that the definition of "securities" would differ for these two purposes.
 
 
 48
 Judge Cabranes's decision in S.N. Phelps & Co. v. Prudential Insurance Company of America, No. 91 Civ. 451, slip. op (D.Conn. Nov. 22, 1991), is also instructive.[13] The question in S.N. Phelps was "whether SNP and Prudential entered into a binding oral agreement . . . for the purchase by SNP and the sale by Prudential of $75 million (face amount) 12.75% Senior Subordinated Notes."[14] Slip op. at 1. Applying the New York version of the U.C.C., Judge Cabranes treated the notes as "securities."[15] See id. at 24. While Judge Cabranes held that SNP's alleged oral contract for the sale of the notes was barred by the statute of frauds, this holding was based on Section 8-319, the then-existing statute of frauds governing the purchase and sale of securities. Section 8-319 was repealed in 1997, and replaced by Section 8-113, the provision at issue in this case. See N.Y. U.C.C. § 8-113 note & cmt. Thus, any oral agreement previously unenforceable by the Section 8-319 statute of frauds now falls within Section 8-113's exemption to the statute of frauds. Applying Judge Cabranes's logic to the present case, then, the Schneiders' notes would be "securities" exempted from the statute of frauds by Section 8-113.
 
 
 49
 
 4. The district court's treatment of the case law
 
 
 
 50
 The district court read ALH Properties and Cohn, Ivers as requiring that "the instruments alleged to be securities represent an investment in the issuing company." Highland, 205 WL 1765711, at *13, 2005 U.S. Dist. LEXIS 14912, at *47-48. Since the debt evidenced by the Schneiders' notes "did not finance McNaughton's company analogous to a stock share," the Court concluded that the Schneiders' notes were not investment instruments. Id. The New York courts have yet to speak on whether promissory notes of the type at issue in this case are properly seen as "investments," and therefore "securities" for U.C.C. purposes. Other sources suggest that "investment" has a broader meaning than the district court's finding. The dictionary defines "investment" as: "[T]he commitment of funds with a view to minimizing risk and safeguarding capital while earning a return." Webster's Third New Int'l Dictionary 1190 (2002). The Schneiders' promissory notes fit comfortably within this definition. In fact, promissory notes are often used as a "medium for investment." See, e.g., Circular Letter No. 17 (2000), May 22, 2000, N.Y. Dep't of Insurance (noting that promissory notes are often sold by licensed insurance agents as a form of investment), at www.ins.state.ny.us/c100 — 17.htm; Broken Promises: Promissory Note Fraud, U.S. Securities & Exchange Commission (explaining that "promissory notes can be legitimate investments"), available at www.sec.gov/investor/pubs/promise.htm. The Schneiders held their notes as any other secure investment, collecting monthly interest payments on each note and expecting return of the principal over time. Further, the notes were marketed to third-party purchasers, i.e., Highland and Fidelty, as a medium for investment, just like any other debt instrument.
 
 
 51
 Moreover, it is clear from the record that McNaughton, a publicly traded company, could have paid the Schneiders in its stock rather than notes. If so, the Schneiders would clearly hold securities. The fact that they took notes instead of stocks should not change the analysis. There is no good reason why notes issued in lieu of stock should not be considered "investment instruments," whereas stock issued by a company to finance the same transactions are "investment instruments." To hold otherwise exalts form over function, and ill serves the needs of the financial marketplace.
 
 
 52
 B. Is This an Important Issue of New York Law and Policy?
 
 
 53
 The unresolved issue of whether promissory notes constitute "securities" for purposes of Article 8 of the New York U.C.C. raises legal and policy issues that we believe are best resolved by the New York Court of Appeals. The lack of congruence between the regulatory definition of a security and the U.C.C. definition of a "security" creates confusion and uncertainty within the financial world. As previously noted, promissory notes like the ones in this case are undoubtedly "securities" for purposes of the Martin Act and the Securities and Exchange Acts of 1933 and 1934. See 15 U.S.C. § 77b(1); N.Y. Gen. Bus. Law § 352(1). But the few New York cases that have addressed the issue have said that the definition of a "security" for purposes of the New York U.C.C. is more narrow than the definition of a "security" for federal and state regulatory purposes. See, e.g., ALH Props., 191 A.D.2d at 9-10, 600 N.Y.S.2d 443. These strained distinctions create problems in the marketplace. Understanding the notes to be "securities," brokers and other industry professionals are not structuring their deals differently to accommodate the more narrow U.C.C. definition. As a result, the rights and duties of buyers and sellers in the marketplace differ depending upon what sort of financial asset they are trading, even when these assets are being sold in the same manner, by the same clients, through the same brokers. Imposing such uncertainty upon the financial community risks deterring the trading of promissory notes in financial markets, thereby restricting the free flow of capital. This is an undesirable result anywhere, but particularly here in New York, the financial capital.
 
 
 54
 New York sources offer differing advice on how to resolve this unintended discord. The legislative notes accompanying the U.C.C. suggest that the courts should expand the definition of "security" to include promissory notes. Section 1-102 of the U.C.C. mandates that the U.C.C. is to be "liberally construed and applied to promote its underlying purposes and policies." N.Y. U.C.C. § 1-102(1). The three primary purposes and policies of the New York U.C.C. are: "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and (c) to make uniform the law among the various jurisdictions." N.Y. U.C.C. § 1-102(2)(a)-(c). The official comment accompanying Section 1-102 makes clear:
 
 
 55
 This Act is drawn to provide flexibility so that, since it is intended to be a semi-permanent piece of legislation, it will provide its own machinery for expansion of commercial practices. It is intended to make it possible for the law embodied in this Act to be developed by the courts in the light of unforeseen and new circumstances and practices. However, the proper construction of the Act requires that its interpretation and application be limited to its reason.
 
 
 56
 Courts have been careful to keep broad acts from being hampered in their effects by later acts of limited scope. They have recognized the policies embodied in an act as applicable in reason to subject-matter which was not expressly included in the language of the act. They have done the same where reason and policy so required, even where the subject-matter had been intentionally excluded from the act in general. They have implemented a statutory policy with liberal and useful remedies not provided in the statutory text. They have disregarded a statutory limitation of remedy where the reason of the limitation did not apply. Nothing in this Act stands in the way of the continuance of such action by the courts.
 
 
 57
 The Act should be construed in accordance with its underlying purposes and policies. The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as also of the Act as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved.
 
 
 58
 N.Y. U.C.C. § 1-102 cmt n. 1 (internal citations omitted). Thus, "the question whether a given arrangement [fits a definition provided in the U.C.C.] should be decided not by dictionary analysis of the words of the definition taken out of context, but by considering whether it promotes the objectives of [the Article]." N.Y. U.C.C. § 8-501 cmt. n. 1.
 
 
 59
 The statutory notes accompanying Article 8 further advise that Article 8 is intended "to promote uniformity with the laws of other states so that the securities market will function in such a way that it will be more stable, and so that investors, both individual and corporate, will be more secure and their rights and interests better protected." L.1997, ch. 566, § 1. The pre-1997 comment to Section 8-102 also advised that the term "security" is "functional rather than formal," and therefore "[t]he ambit of the definition will change as `securities' trading practices evolve to include or exclude new property interests." See ALH Props., 191 A.D.2d at 9, 600 N.Y.S.2d 443 (quoting former comment 2 to New York U.C.C. § 8-102). On this record, there was a wealth of evidence that the Schneiders' notes were treated as "securities" by all who touched them, suggesting that perhaps the time has come to expand "the ambit of the definition" of Section 8-102(15) "security" to include the Schneiders' promissory notes.
 
 
 60
 Because the federal securities laws treat promissory notes issued by publicly traded corporations as "securities," brokers sell them in the same manner as they would other federal securities. They do not alter their selling practices to accommodate the more restricted definition of a "security" contained in the New York U.C.C. As such, financial professionals sell promissory notes in the same manner as stocks or bonds: through the use of electronic and telephonic means of record rather than through a series of writings.[16] As the U.C.C. recognized almost a decade ago:
 
 
 61
 With the increasing use of electronic [and telephonic] means of communication, the statute of frauds is unsuited to the realities of the securities business. For securities transactions, whatever benefits a statute of frauds may play in filtering out fraudulent claims are outweighed by the obstacles it places in the development of modern commercial practices in the securities business.
 
 
 62
 N.Y. U.C.C. § 8-113 cmt. This holds true regardless of whether the broker-dealer is trading a note, stock, bond or any other security. There is no good reason to deny the benefit of Section 8-113 to notes (as opposed to stocks, bonds or other securities) sold by the same industry professionals, yet this would be the inevitable result of finding that promissory notes are not "securities" under Article 8 of the New York U.C.C.
 
 
 63
 On the other hand, the U.C.C. has also cautioned that "the meaning of the statute itself must be found in its text," see N.Y. U.C.C. § 1-102 cmt. 2, and no New York court has yet declared that the text of Section 8-102(15) includes promissory notes. The district court in this case believed that including promissory notes would expand Section 8-102(15) too far. With such minimal and conflicting guidance from the New York courts, however, we believe this tension is better resolved by the New York Court of Appeals.
 
 
 64
 C. Capacity of Certification to Resolve the Litigation
 
 
 65
 The resolution of this issue determines, in large part, the outcome of this appeal, certainly with respect to the seventh claim set forth in Highland's Third Amended Complaint: whether it was a third-party beneficiary to the purported contract between the Schneiders and RBC. The District Court found (1) that a genuine issue of material fact existed as to whether RBC and the Schneiders had entered into a contract, (2) that there was a genuine issue of material fact as to whether the contract was intended for Highland's benefit, and (3) that the purported benefit to be derived from Highland was sufficiently immediate to be protectable. See Cal. Pub. Employees' Ret. Sys. v. Shearman & Sterling. 95 N.Y.2d 427, 434-35, 718 N.Y.S.2d 256, 741 N.E.2d 101 (2000) (identifying the elements of a third-party beneficiary claim). Nevertheless, the district court concluded that it lacked jurisdiction to hear this claim because the applicable statute of frauds, N.Y. U.C.C. § 1-206(1), limited Highland's recovery on the third-party beneficiary claim to $5,000 and the claim thus failed to satisfy the $75,001 threshold set forth in 28 U.S.C. § 1332(a). If the notes are "securities," however, the statute of frauds does not apply. Section 8-113 clearly states: "[A] contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought." N.Y. U.C.C. § 8-113(a). Therefore, if the Schneiders' promissory notes are "securities" for purposes of the New York U.C.C., the district court's application of the statute of frauds — and hence its conclusion that Highland's recovery was limited to $5,000 — was not correct.[17]
 
 CONCLUSION
 
 66
 Given the "dearth of caselaw" on what constitutes a "security" under the New York version of Section 8-102(15) of the New York U.C.C., and the manifest significance of the determination, we believe that certification to the New York Court of Appeals is appropriate. Accordingly, we certify the following question to the New York Court of Appeals:
 
 
 67
 Based on this record, do the eight promissory notes issued by McNaughton Apparel Group, Inc. to the Schneiders fall within the definition of a "security" as contemplated by Section 8-102(15) of the New York Uniform Commercial Code?
 
 
 68
 The New York Court of Appeals may, of course, reformulate or expand upon this question as it sees fit.
 
 
 69
 It is hereby Ordered that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the remaining issues — pertaining to counts one, two and seven of Highland's Third Amended Complaint — once we have receive an answer from the New York Court of Appeals, or once that court declines certification.
 
 
 70
 Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.
 
 CERTIFICATION
 
 71
 The following question is hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and 22 N.Y.C.R.R. § 500.27, as ordered by the United States Court of Appeals for the Second Circuit:
 
 
 72
 Based on this record, do the eight promissory notes issued by McNaughton Apparel Group, Inc., to the Schneiders fall within the definition of a "security" as contemplated by Section 8-102(15) of the New York Uniform Commercial Code?
 
 
 
 Notes:
 
 
 [1]
 The Honorable Paul A. Crotty, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [2]
 This first set of promissory notes was issued on August 29, 2000. Leonard Schneider received a note worth $4 million, Leslie Schneider and Susan Schneider each received notes worth $2.4 million, and Scott Schneider received a note worth $1.2 million, for a total of $10 million
 
 
 [3]
 Leonard Schneider received a note worth $23.6 million, Leslie Schneider and Susan Schneider each received notes worth $14,160,000, and Scott Schneider received a note worth $7,080,000, for a total face value of $59 million
 
 
 [4]
 Because of these qualities, Highland characterizes the notes as "convertible subordinated debentures."See Appellant's Br. 5. On summary judgment, the district court rejected this characterization, however, stating that the notes were not identical to debentures because they were not issued "for the purpose of financing and investment." See 2005 WL 1765711, at *14 n. 19, 2005 U.S. Dist. LEXIS 14912, at *11, 49 n. 19. Given that the promissory notes were issued in exchange for money otherwise owed, money that McNaughton got to keep and use for financing and investment purposes, the district court's limitation may not be appropriate.
 
 
 [5]
 Each Note contained at the top the following restrictive legend:
 THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. IT MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL TO THE MAKER [MCNAUGHTON] THAT SUCH REGISTRATION IS NOT REQUIRED.
 (J.A. A-520, A-532, A-544, A-558, A-569, A-580, A-591, A-602.)
 
 
 [6]
 The $45.4 million represents 7 out of 8 of the notes. Fidelity, an unrelated company, agreed to purchase the remaining Note. Under the agreement, RBC would buy the notes from the Schneiders at 51 cents on the dollar and Highland would then buy the notes from RBC at 52.5 cents on the dollar. This spread of 1.5 cents on the dollar was to be RBC's compensation for the deal
 
 
 [7]
 The Schneiders never spoke directly to Highland about the trade. The oral agreement, if it was actually reached, was formed between the Schneiders and Highland through Rauch and RBC as intermediaries. The Schneiders allege that they never agreed to the trade on March 14, 2001, but RBC and Highland claim that, in an unrecorded conversation on March 14, 2001, Rauch confirmed a sale of $45.4 million in notes to Highland for 51 cents on the dollar
 
 
 [8]
 The Schneiders received $69 million as a result of the payout. If the Schneiders had settled the trade with Highland and Fidelity, the Schneiders would have received only $35.2 million dollars ($0.51 cents on the dollar)
 
 
 [9]
 Highland's claim for third-party beneficiary breach of contract is premised on a theory that the Schneiders and RBC entered into an agreement, through Rauch, for the benefit of Highland. Therefore, the Schneiders' breach of its agreement with RBC injured Highland. RBC intended to act as a "riskless principal" in the sale, purchasing the notes from the Schneiders and then immediately reselling them to third-party purchasers (in this case, Highland and Fidelity) at a premium
 
 
 [10]
 The New York Uniform Commercial Code requires that any contract for the sale of personal property over five thousand dollars be in writing, "signed by the party against whom enforcement is sought or by his authorized agent." N.Y. U.C.C. § 1-206(1). Because "the statute of frauds is unsuited to the realities of the securities business," the sale of "securities" is exempt from the writing requirement set forth in Section 1-206(1)See N.Y. U.C.C. § 8-113(a) & cmt. The provision states: "[A] contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought." N.Y. U.C.C. § 8-113(a). Therefore, if the Schneiders' promissory notes are "securities," then an oral agreement to sell the notes would be enforceable, potentially rendering the district court's grant of summary judgment for defendants erroneous.
 
 
 [11]
 When McNaughton issued the promissory notes to the Schneiders, the issuance was reported to the SEC, and an appropriate press release was published announcing the issuance to the public. While this is done for SEC purposes, without any consideration of the New York U.C.C., it suggests that McNaughton regarded the notes as "securities."
 
 
 [12]
 The definition of a "security" contained in Section 8-102 in 1975, whenBaker v. Gotz was decided, was as follows:
 (a) A "security" is an instrument which (i) is issued in bearer or registered form; and (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and (iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and (iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.
 Baker v. Gotz, 387 F.Supp. at 1389. Both Delaware and New York had adopted identical language.
 This definition is almost identical to the definition set forth in the current version of Section 8-102, except subsection (i) now includes additional language. Under this new language, an obligation or interest does not need to be "in bearer or registered form" to be a "security," as long as it is of the type "the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer." See N.Y. U.C.C. § 8-102(15)(i). If anything, this newly added language appears to broaden the definition of a "security," thereby suggesting that the finding of the Delaware court in Baker v. Gotz that the promissory notes were "securities" under Section 8-102 would apply with equal force today.
 
 
 [13]
 A copy of this decision is found in the Joint Appendix, vol. 1, at A-485 to A-519
 
 
 [14]
 The only difference between the Schneider notes and the S.N. Phelps notes appears to be that the Schneider notes were issued to cover a debt already owed for the purchase of the Schneiders' company, while S.N. Phelps notes were purchased from the issuer in exchange for a cash payment by the defendant holder. The classification of a financial instrument should not turn on whether the holder of the instrument paid in cash or in kind (i.e., by handing over a business), however, and therefore the notes are, for all relevant purposes, identical
 
 
 [15]
 Interestingly, Judge Cabranes assumed the notes were "securities" under the New York U.C.C. without any discussion of the matter
 
 
 [16]
 The RBC Compliance Manual suggests that this is standard practice among securities professionals. (See J.A. A-330 to A-334.)
 
 
 [17]
 We also think it possible that resolution of the question whether the notes are securities may assist in our resolution of counts one and two of Highland's Third Amended Complaint. Accordingly, we reserve judgment on these two claims pending a response to the certified question by the New York Court of Appeals